UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

DAVID CHRISTIE,

                    Petitioner,

    - against -

UNITED STATES OF AMERICA,

                    Respondent.

----------------------------------------X

13 Civ. 7780 (RWS)
08 Cr.  1244 (RWS)
OPINION

A P P E A R A N C E S:

        Pro Se

        DAVID CHRISTIE
        Federal Correctional Complex
        P.O. Box 5010
        Oakdale, LA 71463-5010

        Attorneys for the Respondent

        PREET BHARARA
        United States Attorney for the
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007
        By:  Christian R. Everdell, Esq.
            Christopher D. Frey, Esq.

**Sweet, D.J.**

Petitioner David Christie ("Petitioner" or "Christie") moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (the "Petition") on grounds of ineffective assistance of counsel for failing to (1) object to the Government's purported constructive amendment of Christie's criminal indictment; (2) object to the Government's failure to identify specific property subject to forfeiture; and (3) advise Christie of his right to testify at trial and provide an explanation for why he should not testify.

For the reasons set forth below, Christie's Petition is denied in its entirety.

**<u>Procedural History</u>**

On January 20, 2010, a jury trial commenced against Christie before this Court, after which Christie was found guilty of (1) one count of distribution and possession with intent to distribute 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine and possession with intent to distribute 100 kilograms and more of marijuana, in violation of 21 U.S.C. § 846, and (2) one count of

1

importing into the United States from Jamaica five kilograms and more of cocaine and 100 kilograms and more of marijuana, in violation of 21 U.S.C. § 963.

In late January 2011, this Court reviewed sentencing submissions from both parties and sentenced Christie to 240 months' imprisonment to be followed by 5 years' supervised release.  In accordance with his sentence, Christie was required to pay a special assessment of $200 and to forfeit property in an amount to be determined.  On February 3, 2011, a forfeiture order against Christie was issued in the amount of $3,150,000.

On February 16, 2011, Christie appealed his conviction.  On August 1, 2012, the Second Circuit denied Christie's appeal and affirmed this Court's judgment.  Christie subsequently filed a petition for a writ of certiorari in the United States Supreme Court which was denied on January 7, 2013.

On October 30, 2013, Christie moved to vacate, set aside or correct his sentence, the Petition at issue here.  The Petition was marked fully submitted on March 7, 2014.

**The Facts**


An indictment was filed against Christie on May 20, 2009 ("the Indictment"), alleging two counts.  Count One charged Christie and six others with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846.  Count Two charged Christie and six others with conspiracy to import into the United States five kilograms or more of cocaine and 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 963.


The evidence at trial established that, from 2004 through 2008, Christie was the leader of an international drug trafficking conspiracy that smuggled hundreds of kilograms of cocaine and marijuana from Jamaica into the United States, where the drugs were sold for millions of dollars in profit. Christie used different methods to transport the drugs, but each method involved concealing the drugs on commercial airline flights that departed from Montego Bay, Jamaica and were destined for various United States airports, including Newark Liberty International Airport ("Newark Airport") and Miami International Airport ("Miami Airport").

The Government's proof at trial included (1) the
testimony of three cooperating witnesses — Sekou Gooden, Wayne
Eulett, and Patrick Coulton — each of whom provided an
insider's view of the charged conspiracy and who testified
about the means and methods that Christie and the other
members of the conspiracy used to import the drugs into the
United States and distribute them; (2) the testimony of
Special Agent Christopher Durant of the Department of Homeland
Security, Immigration and Customs Enforcement ("ICE"), who
described an under-cover meeting and subsequent telephone
conversations with Christie, during which they discussed
transporting multi-kilogram quantities of cocaine by boat to
Miami; and (3) the testimony of ICE Special Agent Michael
Alfonso, who, among other things, recounted Christie's post-
arrest admissions that, on multiple occasions, he shipped
large quantities of cocaine on commercial airline flights
traveling from Jamaica to the United States.


1.  The Newark Method (2003-2007)


Christie joined the conspiracy in 2004, when he
became the principal source of cocaine and marijuana.  (Tr.
227-29, 597-600).  Prior to that time, other conspirators had

been smuggling drugs into the United States through Newark Airport (the "Newark Method"). Christie joined other conspirators in importing and distributing drugs using the Newark Method.

Sekou Gooden, a cooperating witnesses, testified about how the Newark Method was initially set up and how it worked. Selmor Reid, one of Gooden's acquaintances from Jamaica with whom he had sold marijuana in the past, supplied the cocaine to a man identified only as "Dave," who worked at the Montego Bay airport. "Dave" would ensure that the drugs were placed on Continental Airlines flights bound for Newark. (Tr. 211-12, 221-22). The drugs were hidden behind a panel in the wall of "Bin Four," an area in the cargo section of the airplane. (Tr. 218-19). Once the drugs were concealed on a plane in Jamaica, Reid would relay the tail number of the plane containing the drugs to Gooden, who would then provide it to Philmour Gayle, a baggage handle for Continental Airlines. (Tr. 219-20). After the plane had landed at Newark Airport, Gayle would identify it by the tail number, remove the drugs from the cargo section, and hand them over to Gooden. (Tr. 220-21). Gooden would, in turn, give the drugs to Gossett McPherson, who would distribute the drugs to customers in the

New York area.    (Tr. 221-22).  During the 2003-2004 winter
season, members of the conspiracy imported over 100 kilograms
of cocaine and over 150 pounds of marijuana from Jamaica into
Newark using this method.[1]  (Tr. 225-26).

     Christie joined the conspiracy for the 2004-2005
winter season.  (Tr. 227-38, 598-610).  Christie joined the
conspiracy because Reid and Gayle had a falling out, and Gayle
refused to work any longer with Reid.    (Tr. 227).  Needing a
new source of supply for cocaine in Jamaica, Gooden asked his
friend Wayne Eulett to contact Christie.    (Tr. 227-28, 599).
Gooden knew that Eulett was friendly with Christie and knew
that Christie was a large-scale drug supplier in Montego Bay.
(Tr. 227-29,599).  Eulett put Christie in touch with Gooden by
phone.    (Tr. 229, 599-600).  When they spoke, Christie told
Gooden that he already knew how the Newark Method worked
because he knew "Dave" at Montego Bay Airport and had spoken
to him about it.    (Tr. 229-30, 232).  Christie negotiated a
commission structure with Gooden -- for every five kilograms
of cocaine that Christie sent, he would give one kilogram of
cocaine to Gayle and the others at Newark Airport as payment.

---

[1] It was noted at trial that the conspirators used the Newark Method primarily
in the winter because customs inspectors seldom patrolled the tarmac then,
making it easier to remove drugs from the planes unnoticed.  (Tr. 224-25).

(Tr. 230-31).   In this way, Christie replaced Reid as the principal source of supply of cocaine and marijuana for the conspiracy.   (Tr. 232).

During the 2004-2005 winter season, the Newark Method worked in much the same way as the prior season.   (Tr. 232-34).   Aside from Christie replacing Reid, the most significant change was that Christie asked Wayne Eulett to be in charge of his cocaine once it arrived in the United States. (Tr. 233-34, 601- 08).   Eulett received Christie's portion of the drugs from Gooden and held them until Christie sent his customers to pick up the drugs.   (Tr. 233, 601-04). McPherson received the remainder of the drugs, which belonged to "Dave," and distributed them to other customers.   (Tr. 233).   Gooden also testified about two other more minor drug suppliers, "Spy" and "Cecil," who placed smaller quantities of their cocaine on the same Continental Airlines flights on three or four occasions.   (Tr. 236-37).   In total, Christie sent over 150 kilograms of cocaine to Newark Airport over the course of the 2004-2005 winter season.   (Tr. 235).

During the 2005-2006 winter season, the price of cocaine rose sharply in Jamaica, making cocaine smuggling much

less profitable.   (Tr. 238).   As a result, Christie started sending marijuana to the United States using the same method. (Tr. 238-39).   Over the course of the 2005-2006 winter season, Christie sent over 150 pounds of marijuana through Newark Airport.   (Tr. 239).

By the end of 2006 and into 2007, the Newark Method was beginning to break down because of the continued high price of cocaine in Jamaica and personal disputes among the co-conspirators.   (Tr. 240, 609-11).   Gooden had a falling out with McPherson because he found out that McPherson was romantically involved with Gooden's wife.   (Tr. 240, 610). Also, Christie became upset with Eulett for giving some of his cocaine to Gooden without permission.   (Tr. 609-10).   As a result, Eulett broke off contact and moved to Philadelphia. (Tr. 610-11).   In addition, Gayle and the team at Newark Airport refused to receive any more loads of marijuana.   (Tr. 269-74, 288-90, 292- 95; GX 201T, GX 206T, GX 207T). Although Christie continued to press Gooden to convince the team at Newark Airport to receive shipments of marijuana (Tr. 292-95; GX 207T), by the end of 2007 the Newark Method was effectively defunct.

2. The Miami Method (2007-2008)

    With the Newark Method facing serious problems,
Christie explored a different distribution channel and began
sending cocaine on flights from Montego Bay Airport to Miami
International Airport (the "Miami Method").  The Miami
Method, which lasted from 2007 through March 2008, was
described by cooperating witness Patrick Coulton. (Tr. 703-
28). Coulton worked for American Airlines as a baggage
handler in Miami. (Tr. 692-93). For several years prior to
his arrest in March 2008, Coulton had unloaded drugs from
flights that came into Miami from Jamaica. (Tr. 703-06).
These drugs were hidden behind the walls of certain sections
of the passenger cabin of the plane. (Tr. 706, 708). Until
early 2007, Coulton's principal contacts in Jamaica for these
drug shipments were Peter Dixon, and, later, David Lewis.
(Tr. 705 - 07).

    Christie inserted himself into this pre-existing
distribution channel in the beginning of 2007.  (Tr . 713 -
15).  In early 2007, Coulton began speaking to someone he
knew only as the "Boss" or "Big Man," who was the new source
of supply for the cocaine entering Miami Airport.  (Tr. 713-

14).   Telephone records and Coulton's voice identification confirmed that the "Boss" was Christie.   (Tr. 717-18; GX 103A, GX 504B, GX 505B).

Coulton received the tail number of the inbound plane containing the drugs from either Christie or David Lewis, and used it to track the plane and identify it when it landed in Miami. (Tr. 709-10). Coulton then entered the airplane and removed the drugs. (Tr. 710-11). He then reported to Christie or Lewis that he had received the drug shipment and received instructions from one of them about where to deliver the drugs in Miami. (Tr. 712-13, 718-20). This method was in place up until March 11, 2008, when Coulton was arrested in possession of approximately two kilograms of Christie's cocaine. (Tr. 722-25; GX 102, GX 603).

3. Christie's Negotiations with the Undercover Agent and
   Arrest (2008-2009)

With the Miami Method shut down, Christie explored other avenues to continue distributing his cocaine and marijuana. Throughout the first half of 2008, Christie spoke

several times to Gooden to persuade him to convince Gayle
that the price of cocaine in Jamaica was too high and that
the Newark team should start receiving loads of marijuana
instead. (Tr. 269-74, 288-90, 292-95; GX 201T, GX 206T, GX
207T). Christie also spoke to Gooden about a plan to start
sending cocaine to the United States on flights leaving from
Trinidad and Tobago, where Christie could obtain cocaine more
cheaply, by hiding the cocaine behind "Bin Four" in the cargo
section of the airplane -- the same hiding spot that was used
in the Newark Method. (Tr. 280-291; GX 203T, GX 206T, GX
410).

     Unbeknownst to Christie, Gooden had been arrested on
December 20, 2007, and was cooperating with the Government.
(Tr. 242-46). Law enforcement officers instructed Gooden to
tell Christie that he could introduce him to a drug
trafficker named "Bigga," who owned a boat and who could help
Christie smuggle cocaine from Panama into the United States.
(Tr. 296-97).  In fact, "Bigga" was ICE Special Agent
Christopher Durant serving in an undercover capacity. (Tr.
482).

On September 24, 2008, Christie met with Special
Agent Durant in Jamaica. (Tr. 482-83). At that meeting,
Christie discussed using Special Agent Durant's boat to
transport a load of marijuana to the Bahamas so that he could
amass enough money to pay Colombian paramilitaries for 300
kilograms of cocaine that he would then conceal in Special
Agent Durant's boat and ship to Florida. (Tr. 488-517; GX
212T). After the meeting, Christie and Special Agent Durant
spoke several times by telephone to further discuss the
proposed drug transaction. (Tr. 518-39; GX 213T-216T, GX
219T, GX 225T).

On January 19, 2009, Christie traveled to Panama to
meet with Special Agent Durant about the proposed boat
transaction. (Tr. 799). Christie was refused entry into
Panama and was flown to Miami, where he was arrested. (Tr.
799, 802-03). Following his arrest, and after being advised
of his Miranda rights, Christie made several statements to
law enforcement officers regarding his past criminal
activity. (Tr. 809-19). Among other things, Christie stated
that he started sending marijuana from Jamaica to the United
States in 1995, and that he started sending cocaine from
Jamaica to the United States in 1996 using Colombian and

12

Jamaican suppliers.  (Tr. 812-13, 817).  Christie said that

he used airplanes to send the drugs from Jamaica, and said

that he had a contact at the Montego Bay airport who helped

get the drugs on the flights.  (Tr. 813).  Christie also said

that he knew Eulett, who he knew by the nickname "Primer,"

and that Eulett introduced him to Gooden, whom he knew as

"Q."  (Tr. 818).  Christie further stated that he sent Gooden

multiple kilograms of cocaine over a period of several years,

and that some of the cocaine went to Eulett. (Tr. 818).

Finally, Christie said that in early 2008, he started sending

drugs to someone in Miami named "Mr. P," who was later

established to be Mr. Coulton, who worked for American

Airlines at Miami Airport. (Tr. 715, 818).


Christie did not offer any evidence in his defense at

trial.


## Applicable Standard


In order to prevail on a claim of ineffective

assistance of counsel, a defendant must satisfy two rigorous

legal standards: (1) that counsel's performance fell below "an

objective standard of reasonableness" under "prevailing

professional norms," Strickland v. Washington, 466 U.S. 668, 688-89 (1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 693-94.  The Petitioner need not establish that he will necessarily succeed on his claims, but he must establish that the claim is plausible.  Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (quoting Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000).

Under the first prong of the Strickland analysis, the defendant must overcome a "strong presumption" that counsel's conduct generally "'falls within the wide range of reasonably professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'"  United States v. Aguirre, 912 F.2d 555, 560 (2d. Cir. 1990) (quoting Strickland, 466 U.S. at 689).  Accordingly, it is well established that "[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance."  Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994) (internal quotation marks omitted).  A fair assessment of the reasonability of an attorney's actions requires an evaluation of

14

"challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and must resist the temptation of hindsight.  Id., at 690.

By contrast, a finding of prejudice under the second prong of the Strickland test relies on the benefit of hindsight in order to determine "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."  Henry v. Poole, 409 F. 3d 48, 63-64 (2d Cir. 2005)(quoting Strickland, 466 U.S. at 695). 'Reasonable probability' in this context means the attorney's errors were of such magnitude that they "undermined confidence in the outcome."  Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001).

Even so, "an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001)(internal quotation marks omitted)(quoting Strickland, 466 U.S. at 691). Indeed, the central inquiry of the prejudice prong of the Strickland test is whether the result of the trial would have been different, not whether counsel committed an error, irrespective of its impact, reasonable or not.

15

## Discussion

As set forth below, each of Christie three arguments that he was provided ineffective assistance of counsel must fail under a Strickland analysis.

### A. The Indictment Was Not Constructively Amended

Christie argues first that he was denied effective assistance of counsel because his defense attorney failed to object to the Government's purported constructive amendment of the Indictment. (Pet. at 10). To prevail on a constructive amendment claim, a defendant must show "the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment." United States v. Rigas, 490 F.3d 208, 225 (2d Cir.2007)(internal quotation marks and alterations omitted). In other words, a defendant must establish "that the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. D'Amelio, 683 F.3d

16

412, 416 (2d Cir. 2012)(quoting United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988))(emphasis added in D'Amelio).

Courts in the Second Circuit have "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." United States v. Banki, 685 F.3d 99, 118 (2d Cir. 2012)(quoting Rigas, 490 F.3d at 228)(emphasis in Banki; footnote and internal quotation marks omitted). They have clarified that "where a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment." Rigas, 490 F.3d at 228 (alteration and internal quotation marks omitted). Facts which increase a mandatory minimum sentence, however, must be submitted to the jury and found beyond a reasonable doubt. Alleyne v. United States, 133 S. Ct. 2151, 2158 (2013).

More specifically, drug quantity is an essential element of an "aggravated" drug offense and "must always be pleaded and proved to a jury or admitted by a defendant to support conviction or sentence on an aggravated [drug] offense[.]" United States v. Gonzalez, 420 F.3d 111, 131 (2d Cir. 2005). See also Alleyne, 133 S. Ct. at 2163. As such, conviction on an aggravated drug offense when the indictment

17

does not allege specific statutory drug quantities is an error "akin to a constructive amendment." U.S. v. Thomas, 274 F.3d 655, 670-671 (2d Cir. 2001).

Indictments need not charge a defendant with a lesser-included offense, however, in order for the trial court to submit that offense to the jury. U.S. v. Dhinsa, 243 F.3d 635, 674 (2d Cir. 2001).[2]  A defendant who is charged with an aggravated drug offense may still be convicted of a "lesser-included" drug amount, even if that lesser amount is not specifically alleged in the indictment. See United States v. Berrios, 279 Fed. App'x 82, 85 (2d Cir. 2008).

Christie argues that he received ineffective assistance of counsel because his attorney failed to object to a purported constructive amendment of the Indictment on two grounds: (1) that the jury was permitted to find drug amounts that were not specifically alleged in the Indictment because the jury instructions and verdict sheet included lesser-included amounts of cocaine and marijuana for both counts of the Indictment and (2) that the Indictment was constructively

---

[2] In the context of drug trafficking crimes, "lesser-included" offenses refer to offenses involving smaller drug amounts than the particular statutory quantities alleged in the indictment.  See United States v. Evans, 293 Fed. App'x 63, 68 (2d Cir. 2008).

amended by the introduction into evidence of hashish and heroin transactions, which were drug types that were not present in the Indictment, and the general use of the word "narcotics" in the charge made to the jury after the references to hashish and heroin were made.  Both of Christie's arguments as to constructive amendment must fail on their own merits and, consequently, as bases for an ineffective assistance of counsel claim.

### 1. Submission of Lesser-Included Offenses to the Jury Did Not Constitute A Constructive Amendment

Drug quantities that increase mandatory minimum sentences must be alleged in the indictment and found by a jury. Gonzalez, 420 F.3d at 131.  By contrast, a jury may consider -- and convict on -- lesser-included offenses even if those offenses are not specifically alleged in the indictment.  See Dhinsa, 243 F.3d at 674; see also Berrios, 279 Fed. App'x at 85 (no constructive amendment where defendant was charged with conspiring to distribute five kilograms or more of cocaine, but jury found between 500 grams and five kilograms).  The Supreme Court's recent decision in Alleyne, on which Christie heavily relies, does not alter this standard.[3]

---

[3] Alleyne held that any fact that increases the mandatory minimum penalty must be alleged in the indictment and submitted to the jury.  The Government

Christie argues that the inclusion of the lesser-included offenses in the jury instructions and the verdict sheet constituted a constructive amendment by going beyond the scope of the Indictment and allowing the jury to "determine elements of the crime outside of the elements determined by the grand jury." (Pet. at 14). Under Dhinsa, however, submission of less-included offenses to the jury is not improper. Moreover, were there not sufficient basis in case law to allow the submission of the lesser-included charges, the fact that Christie was not even convicted on the lesser-included amounts that were ultimately listed on the verdict sheet defeats his claim. (See Tr. 1048-50).

The Indictment charged Christie with participating in two narcotics conspiracies, each of which involved "5 kilograms and more" of cocaine, pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 960(b)(1)(B), and "100 kilograms and more" of marijuana, pursuant to 21 U.S.C. §§ 841(b)(1)(B) and 960(b)(2)(G). There is no dispute that the jury convicted Christie of both counts listed in the Indictment and specifically found that the

---

rightly points out that this has been the rule in the Second Circuit with respect to drug quantities since Gonzalez in 2005, predating both the Alleyne decision and the Indictment in Christie's case. See Gonzalez, 420 F.3d at 131.

conspiracies involved those very same drug amounts.  (See Tr. 1048-50).[4]  The scope of the Indictment, in other words, remained exactly the same.

As such, Christie has failed to establish that any uncertainty exists whatsoever as to whether he was convicted of conduct other than that which was the subject of the grand jury's indictment.  See Rigas, 490 F.3d at 227.  Christie's claim that he received ineffective assistance of counsel on this argument must then, likewise, be rejected, as his attorney would have had no basis in law to object to the inclusion of the lesser-included charges on the verdict sheet on constructive amendment grounds.

### 2. Introduction of Evidence of Hashish and Heroin and General Use of the Word "Narcotics" Did Not Constitute A Constructive Amendment

Christie's argument that the introduction into evidence of testimony regarding hashish and heroin, and the general use of the word "narcotics" after their inclusion, must also be rejected.  The relatively sparse references to hashish

---

[4] If anything, the inclusion of the lesser-included charges afforded Christie the opportunity to be indicted either on the higher quantities alleged in the indictment or the lesser-included amounts, which carried less severe mandatory minimum sentences.

and heroin in the trial record, and the context in which they were introduced, strongly indicates that their introduction into evidence had little to no effect on the outcome of the case. Neither did these references cast doubt on what crimes Christie was indicted on and convicted of.  See Banki, 685 F.3d at 118 (courts in the Second Circuit have "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial" (internal quotation marks and citation omitted; emphasis in Banki).  As state above, Christie was unambiguously convicted on the very same charges on which he was indicted.

        The trial transcript tends to indicate that testimony regarding hashish and cocaine did not operate to specifically connect Christie to these drugs.  The only type of drug that Coulton -- the witness who testified that he himself had been involved in the unloading shipments of hashish, in conjunction with marijuana and cocaine, at Miami International Airport -- ever specifically connected to Christie was cocaine.  (Tr. 712-713, 720, 722-725).  Coulton never testified that Christie sent hashish to Miami.  Neither was testimony regarding heroin directly linked to Christie.  (Tr. 400-03).  All of the testimony pertaining to heroin related to conversation between Gooden and another cooperating witness.  Id.  Christie was not

mentioned in these conversations and was not linked to any
transaction involving heroin.  Id.

Furthermore, Christie's attempt to construe the
general use of "narcotic" in the charge to the jury as an
imprecision that might have led to his conviction "on a charge
the grand jury never made" against him is directly contradicted
by the fact that sufficient evidence was entered on the charges
pertaining to cocaine and marijuana and the fact that Christie
was, in fact, convicted of the charges in the Indictment without
variation.  (Pet. at 15).  Given the scarcity of and lack of
emphasis on the evidence pertaining to hashish and heroin, it is
implausible that this Court's use of the word "narcotics" in its
instructions to the jury modified the essential elements of the
offense charged such that "there is a substantial likelihood
that the defendant may have been convicted of an offense other
than that charged in the indictment."  See D'Amelio, 683 F.3d at
416 (quoting Mollica, 849 F.2d at 729) (emphasis added).

Accordingly, for the reasons stated above, a claim of
ineffective assistance of counsel which seeks to establish that
Christie's attorney should have objected to the mere mention of
other narcotic substances -- and the use of "narcotic" as a
general term after their mention -- as constructive amendments

23

of the indictment misses the mark and must be denied.

## B. Petitioner Was Not Entitled to Jury Determination of Forfeitable Property

Christie contends that his attorney provided
ineffective assistance of counsel, ostensibly by failing to
object to the "circumvention" of a jury determination of
specific property for forfeiture by only seeking a money
judgment.[5]  (Pet. at 17).  21 U.S.C. § 853(a) provides for
forfeiture of property by any person who is convicted of a
violation of the Controlled Substances Act.  Under § 853, the
government may seek to forfeit, among other things, specific
property used by the defendant in the commission of the offenses
of the conviction, or, if it chooses, may seek a money judgment
in an amount estimated to be correlative to the proceeds
obtained by the defendant as a result of the offenses of the
conviction.

Under Rule 32.2 of the Federal Rules of Criminal
Procedure, if the Government seeks to forfeit specific property

---

[5] Christie's pro se Petition is not entirely clear, but construing the
Petition liberally as courts must, this Court interprets the Petition to
allege that the Government chose to seek a money judgment purposely to
circumvent a jury determination of the nexus between the property to be
seized and the commission of the crimes he was convicted of.  (Pet. 17-18.)
See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("[A] pro se complaint,
however inartfully pleaded, must be held to less stringent standards than
formal pleadings drafted by lawyers.").

24

after trial, the defendant and the Government each have the
option of requesting that the jury determine whether the
specific property is subject to forfeiture. See Fed. R. Crim.
P. 32.2(b)(5) ("In any case tried before a jury . . . the court
must determine . . . whether either party requests that the jury
be retained to determine the forfeitability of specific
property[.]"). If the Government seeks a money judgment,
however, the Court alone determines the forfeiture amount at
sentencing. See United States v. Perkins, No. 09-CR-968 (DLI),
2014 WL 119326, at *1-*2 (E.D.N.Y. Jan. 10, 2014) ("[I]f the
government does not seeks specific property, but rather a
personal money judgment, the court itself determines the amount
of money that the defendant will be ordered to pay.") (quoting
United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL 2783360,
at *11 (E.D.N.Y. July 15, 2008)). The defendant is not entitled
to have the jury decide the amount of the money judgment. See
United States v. Tedder, 403 F.3d 836, 841 (7th Cir. 2005); see
also United States v. Watts, 934 F. Supp. 2d 451, 493 (E.D.N.Y.
2013) (Rule 32.2 does not provide for a jury determination of a
money judgment forfeiture).


        Courts outside of this Circuit have clearly indicated
that the Government has the discretion to choose whether to
pursue a money judgment rather than forfeiture of specific

property.  United States v. Gregoire, 638 F.3d 962, 972 (8th
Cir. 2011) ("to avoid submitting forfeiture issues to the jury,
the government abandoned this claim of forfeiture in the
indictment").  In the event that the Government should choose to
seek a money judgment, the Court is not required to ascertain
whether a defendant prefers a jury determination of
forfeitability of specific property via special verdict.  See
United States v. Grose, 461 F. App'x 786, 806 (10th Cir. 2012)
cert. denied, 133 S. Ct. 213 (2012) ("The government did not
seek forfeiture of any specific property in the indictment.  The
district court was not required to determine if Grose wanted a
special verdict.") (emphasis in original); see also Perkins,
2014 WL 119326, at *1-*2 (quoting Galestro, 2008 WL 2783360, at
*11).


               In this case, the Government sought only a money
judgment.  As a result, Christie had no right under Rule 32.2 or
otherwise to a jury determination of the money judgment, nor did
he have a separate right to challenge the government's election
to seek a money judgment in lieu of a jury-determined forfeiture
of specific property.  Accordingly, Christie's ineffective
assistance of counsel claim must fail as his attorney would have
had no clear basis in law on which to levy an objection.

**C. Petitioner Was Not Denied the Right to Testify At Trial**

Christie contends that his counsel failed both to (1) advise Christie of his constitutional right to testify at trial and (2) provide an explanation for why he had advised him not to testify. (Pet. at 18). Both arguments must be rejected.

Every defendant in a criminal case has a constitutional right to testify on his or her own behalf. Rock v. Arkansas, 483 U.S. 44 (1987); United States v. Ferrarini, 219 F.3d 145, 151 (2d Cir. 2000). Defense counsel must inform the defendant of his or her right to testify and offer advice on whether or not that right should be exercised. In doing so, defense counsel "should always advise the defendant about the benefits and hazards of testifying and not testifying, and may strongly advise the course that counsel thinks best." See Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997). When all is said and done, however, the defendant -- rather than defense counsel -- is the one who must ultimately decide whether or not to exercise the right to testify. See id. at 78 (collecting cases).

If a defendant wishes to waive the right to testify, he or she simply remains silent. See Brown, 124 F.3d at 78-79 (collecting cases). An on-the-record colloquy is generally not

conducted when a defendant waives the right to testify.   In
fact, requirement of an on-the-record colloquy has been rejected
due to concerns that it could inappropriately influence the
defendant to testify, thereby jeopardizing the right against
self-incrimination, and because it would require the trial court
to inject itself into a sensitive area of trial strategy
properly reserved to the defendant and his attorney.   See id. at
79 & n.2; see also United States v. Pennycooke, 65 F.3d 9, 11
(3d Cir. 1995).

          Courts have observed, however, that the absence of an
on-the-record waiver of the right to testify opens the door to
conviction challenges on the basis that a defendant was not
informed of their right to testify, or that they were ordered by
the attorney to waive their right.   In response to this concern,
courts have emphasized that in order to establish a denial of
the right to testify, a "barebones assertion by a defendant,
albeit under oath, is insufficient to require a hearing or other
action on his claim that his right to testify in his own defense
was denied him.   It just is too facile a tactic to be allowed to
succeed."   Underwood v. Clark, 939 F.2d 473, 476 (7th Cir.
1991); see also United States v. Castillo, 14 F.3d 802, 805 (2d
Cir.), cert. denied, 513 U.S. 829 (1994).

A defendant's claim of denial of right to testify is thus reviewed in the same manner as an ineffective assistance of counsel claim under Strickland.  See Brown, 124 F.3d at 79 ("Because the burden of ensuring that the defendant is informed of the nature and existence of the right to testify rests upon defense counsel, we conclude that this burden is a component of the effective assistance of counsel").  A defense attorney's failure to inform a defendant of his right to testify is sufficient to satisfy the performance prong of the Strickland test, though courts are entitled to presume that such misconduct on the part of defense counsel is rare.  See Brown, 124 F.3d at 80 (citing United States v. Teague, 953 F.2d 1525, 1534 (11th Cir.) (en banc), cert. denied, 506 U.S. 842 (1992)); see also Strickland, 466 U.S. at 689; Pennycooke, 65 F.3d at 12.

While it is undoubtedly preferable that a defense counsel clearly and unambiguously advise his client of a defendant's constitutional right to testify in his own defense, in practice, not all instances of advice are perfectly delivered.  Courts are entitled to presume that blatant misconduct on the part of defense counsel in this arena is rare. In Christie's case, there is no reason to suspect that Christie was not adequately informed.  See Brown, 124 F.3d at 80 (citing United States v. Teague, 953 F.2d 1525, 1534 (11th Cir.) (en

banc), cert. denied, 506 U.S. 842 (1992).  If, in fact, it were the case, as Christie contends, that defense counsel had advised Christie not to testify without providing an explanation, the advice that he not testify would have necessarily flagged for Christie that there was an opportunity for him to testify at trial that he was electing not take advantage of.  Furthermore, in the absence of evidence corroborating Christie's bare assertion that his right to testify in his own defense was denied him, a hearing or other action on this particular claim is not warranted.  See Underwood, 939 F.2d at 476; see also Castillo, 14 F.3d at 805 (citing Underwood).[6]

Similarly, Christie offers no proof but his bald assertion that his attorney did not provide an explanation in order for him to make an informed decision.  This claim must also, then, be disregarded.  To be sure, from an evidentiary perspective, it would be difficult for Christie to provide proof of a total lack or absence of his attorney's explanation of his right to testify.  Nevertheless, a bare assertion that no explanation was given unaccompanied by any corroborating

---

[6] It bears noting that repeated reference was made regarding Christie's right to testify (or not) at trial. (See Tr. 144, 891, 899, and 1035).  While this is not dispositive as to whether Christie's counsel performed his professional duty in advising Christie on his constitutional right to testify in his own defense, it provides further indication that both Christie would have been aware of his opportunity to testify, as well as the fact that he was explicitly -- on the advice of his lawyer -- choosing not to take the stand.

evidence, however, cannot automatically nudge Christie's claim

into the realm of plausibility.  See Aguirre, 912 F.2d at 560

(quoting Strickland, 466 U.S. at 689); see also Puglisi, 586

F.3d at 213 (quoting Armienti v. United States, 234 F.3d 820,

823 (2d Cir. 2000)).


        Moreover, assuming arguendo that Christie was not

adequately advised with respect to his right to testify, his

claims must still fail as he cannot show, under the prejudice

prong of the Strickland test, that "there is a reasonable

probability that but for counsel's unprofessional errors, the

result . . . would have been different."  Strickland, 466 U.S.

at 692.  Christie includes in his Petition statements that he

claims he would have made had he taken the stand and which he

argues would have created a reasonable doubt in the mind of the

jury.  (Pet. at 18-21).  His arguments are, however,

unpersuasive as the evidence entered against Christie at trial

overwhelmingly tended toward proving his guilt.


        Christie's characterization of the trial as a

credibility contest is inaccurate.  At trial, the Government

presented, among other things, (1) the testimony of three

cooperating witnesses who each worked with Christie during and

in relation to the charged conspiracy, (2) the testimony of an

31

ICE agent who described an undercover meeting and subsequent telephone conversations with Christie, during which they discussed transporting multi-kilogram quantities of cocaine by boat to Miami, and (3) the testimony of another ICE agent, who, in addition to other statements, recounted Christie's post-arrest admissions that, on multiple occasions, he shipped large quantities of cocaine on commercial airline flights traveling from Jamaica to the United States.  Christie argues in his Petition that he would have contested and/or denied all evidence entered against him, or that certain damning evidence was produced under duress.  (Pet. at 18-21).  It cannot be said, however, that in the face of such devastating evidence entered against him, that there is a 'reasonable probability' that Christie's categorical denials would have effected a different outcome.  See Strickland, 466 U.S. at 693-94; see also Puglisi, 586 F.3d at 214.  Accordingly, Christie's claim that but for his attorney's failure to advise him of his right to testify -- and, in turn, Christie's subsequent failure to exercise that right -- the result of the trial would have been different must be denied.

## CONCLUSION

Based upon the facts and conclusions of law set forth above, Petitioner's motion to vacate, set aside, or correct his sentence is denied.

It is so ordered.

New York, NY
May 22, 2014

_____
ROBERT W. SWEET
U.S.D.J.